# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

CARRIE ANN GULA,                    :

         **Plaintiff**        :        **CIVIL ACTION NO. 3:14-2210**

        **v.**              :            **(JUDGE MANNION)**

FRANK NOONAN,                       :
*et al.,*
                  :
        **Defendants**

## MEMORANDUM

This is a civil rights action brought pursuant to 42 U.S.C. §1983, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S.A. §951, *et seq*., by plaintiff, Carrie Ann Gula ("Gula"), in which she alleges violations of her constitutional rights arising out of her employment with the Pennsylvania State Police ("PSP") and an alleged assault incident between Gula and her boyfriend on August 1, 2012.

Presently pending is the partial motion for summary judgment motion of defendants Brogan, Krawetz, O'Hara, Captain David Dougalas ("Dougalas"), Major Edward Hoke ("Hoke"), and the PSP, pursuant to Fed. R. Civ. Pro. 56, regarding Counts I, III, IV, V, VI, VII, and VIII of the plaintiff's amended complaint, (Doc. 19).[1] (Doc. 34).

---

[1]On November 9, 2017, the court granted the partial motion for summary judgment of defendants Brogan, Krawetz and O'Hara regarding

Based upon the following discussion, the Doc. 34 partial motion for summary judgment will be **DENIED IN ITS ENTIRETY**.

## I.    PROCEDURAL HISTORY

Gula is proceeding on her amended complaint under §1983, Title VII and the PHRA which was filed on August 29, 2016. (Doc. 19). The plaintiff's amended complaint raises eight counts, to wit: (1) First Amendment retaliation claim and Fourteenth Amendment equal protection claim based on her sex against the individual defendants[2] in violation of 42 U.S.C. §1983; (2) malicious prosecution claim in violation of the Fourth Amendment and §1983 against Krawetz, and Brogan; (3) sex discrimination claim under Title VII against PSP; (4) sex discrimination claim against all defendants under the PHRA; (5) hostile work environment claim based on sex under Title VII against PSP; (6) hostile work environment claim based on sex against all defendants under the PHRA; (7) retaliation claim under Title VII against PSP; and (8) retaliation claim against all defendants under the PHRA.

---

Counts IV, VI and VIII of Gula's amended complaint, i.e., her claims under the PHRA for sex discrimination, hostile work environment based on sex and retaliation, to the extent Gula sought to hold these three defendants individually liable. (Doc. 31). The court also dismissed with prejudice Gula's PHRA claims against the PSP. (Doc. 97). Also on that date, the court denied the partial motion for summary judgment of Brogan and Krawetz with respect to Gula's §1983 malicious prosecution claim, Count II. (Doc. 95).

[2]The remaining individual defendants are Krawetz, Brogan, Dougalas, Hoke, and O'Hara.

2

On March 22, 2017, Brogan, Krawetz, O'Hara, Dougalas, Hoke, and the PSP filed a partial motion for summary judgment motion, pursuant to Rule 56, regarding Counts I, III, IV, V, VI, VII, and VIII of the plaintiff's amended complaint. (Doc. 34). They simultaneously filed their statement of facts with exhibits and a brief in support. (Doc. 35, Doc. 36, Docs. 37-63). The plaintiff filed her brief in opposition to the Doc. 34 motion and her response to their statement of facts on May 10, 2017. (Doc. 86, Doc. 87). Plaintiff filed exhibits in support of her brief. (Docs. 76-83). Defendants filed a reply brief on June 7, 2017. (Doc. 91). Their Doc. 34 motion is now ripe for disposition by the court.

This court has jurisdiction over Gula's federal claims pursuant to 28 U.S.C. §1331 and §1343 as well as 42 U.S.C. §2000e–5(f)(3). The court can exercise pendent jurisdiction over the state law claims under 28 U.S.C. §1367. Venue is proper in this court under 28 U.S.C. §1391.

## II.    MATERIAL FACTS

The court incorporates by reference the material facts of this case from its November 9, 2017 Memoranda, (Doc. 94, Doc. 96).[3]

_____

[3]The additional material facts are derived from defendants' statement of material facts, (Doc. 35), from plaintiff's responses thereto, (Doc. 86), as well as the exhibits submitted by the parties. Also, the court limits its discussion to the material facts pertaining to the Doc. 34 summary judgment motion. The court has omitted any legal conclusions from the material facts. With respect to defendants' summary judgment motion, the court views the

At all relevant times, Gula was an employee of the PSP. She was a PSP Trooper assigned to the Patrol Section at the Trevose Barracks, Troop M, from August 2009 until October 29, 2011. (Doc. 84, Ex. 9). While at the Trevose Barracks, Gula filed a complaint with the PSP alleging that she was being sexually harassed by PSP Trooper Donald C. Brackett, who was also assigned to that barracks. As a result of Gula's complaint, an internal affairs investigation ("IAD") was initiated in August 2010 which focused on Brackett ("Brackett IAD"), IAD 2010-05726, and his alleged harassment of Gula. Brogan, Hoke, Krawetz and Dougalas were not aware of the Brackett IAD prior to the filing of the instant action.

Additionally, when Gula was stationed at the Trevose Barracks, she provided statements in other IAD investigations which were conducted at the Trevose Barracks. Brogan, Hoke, Krawetz and Dougalas were not aware that Gula had made statements in other IAD investigations at the Trevose Barracks. O'Hara testified that he reviewed prior IADs involving Gula when he was investigating the false report misconduct charges against Gula. He reviewed the Brackett IAD, the Joyce Knoll IAD, and the Greener case, all of which involved allegations of sex discrimination in which Gula was listed as a witness.

---

facts in the light most favorable to plaintiff. *See* Hampden Real Estate, Inc. v. Metropolitan Management Group, Inc., 142 Fed.Appx. 600, 602 (3d Cir. 2005).

4

On October 29, 2011, Gula received a hardship transfer to Troop N, Fern Ridge Barracks, in Monroe County, PA, where she was assigned to patrol under the supervision of Station Commander Sean Jennings.

Gula's former supervisor at Trevose Barracks issued a report finding that she was subjected to sexual harassment by Brackett. On July 18, 2012, a Department Disciplinary Officer ("DDO") issued misconduct charges against Brackett, namely, Unbecoming Conduct, Discrimination or Harassment, Sexual Impropriety, Performance of Duty, Use of Equipment and Property. Gula's claims of sexual harassment were then sustained by the PSP. Brackett was disciplined and he received a 15-day Suspension Without Pay ("SWOP") in July 2012. Brackett filed a grievance regarding the SWOP and it was reduced eight days. Also, the charge of sexual impropriety was removed from his record based on his grievance.

Gula's evidence, (Doc. 86 at 2), also shows as follows:

As of August 2012, Gula was the only female in her barracks at Fern Ridge. Of the handful female members of Troop M, Gula's Troop, two were subject to a court martial in recent years: Andrea Young and Carrie Gula. (Exhibit 13; Exhibit 71). Both Young and Gula's court martials were overturned through arbitration and they were awarded back pay. (Id.). Both Young and Gula have subsequently been promoted to the rank of Corporal. (Exhibits 11, 13).

In August of 2012, Gula remained stationed in Troop M, at the Fern Ridge Barracks. On August 2, 2012, Gula reported to Jennings that she was assaulted in her uniform by her boyfriend, Eric Thomas, on August 1, 2012,

in his house in Luzerne County, PA. Jennings contacted the Troop Headquarters and talked to Lieutenant Brian Tobin and Dougalas, and he was advised to make a report to Troop P, Wyoming.

On August 8, 2012, Jennings also sent an email summary of his August 2 meeting with Gula to his supervisors, Hoke and Dougalas. The Criminal Investigation Unit at Troop P, PSP Wyoming, in Luzerne County, was then assigned to investigate Gula's alleged domestic assault incident. Jennings told Gula to report to Krawetz, Commander of the Criminal Section at PSP Wyoming. Krawetz then directed Brogan to investigate Gula's assault allegations. As part of her investigation, Brogan told Gula to make a written statement regarding her allegations on August 2, 2012. Jennings was never interviewed by Krawetz or Brogan regarding Gula's allegations.  On August 7, 2012, Brogan and Krawetz determined that Gula's domestic violence allegations were "unfounded." On August 8, 2012, Krawetz entered a Blue Team Entry into PSP's internal affairs reporting system indicating that there was an allegation of misconduct by Gula, namely, the filing of false reports. Krawetz did not determine the outcome of the Blue Team Entry. Rather, he only reported the alleged misconduct by Gula and the fact that he initiated a criminal investigation into Gula for the crime of false reports regarding her assault allegations against Thomas. Also, during the course of the investigation into the alleged assault incident Gula had reported, Thomas claimed that Gula had "illegally accessed his 'My Verizon' online account."

Thus, on August 8, 2012, Krawetz commenced a criminal investigation regarding Gula for computer crimes in addition to false reports. (Doc. 40 at 76).

On August 9, 2012, Dougalas placed Gula on restricted duty status pending the outcome of the criminal and internal affairs investigations regarding her alleged false statements. Upon conclusion of the investigations, the PSP and its officials determined that Gula should be criminally charged with making false statements to law enforcement officials and for computer trespass crimes.

In November 2012, Krawetz met with members of the Luzerne County DA's Office and gave them a copy of his criminal investigation into Gula. On December 4, 2012, the DA approved of criminal charges and, Krawetz filed the criminal complaint against Gula on December 13, 2012. Also, a felony arrest warrant for Gula was obtained by Krawetz from Magisterial District Judge Joseph J. Carmody. (Doc. 81-6, Doc. 81-7).

Further, on December 13, 2012, Gula was suspended without pay by Hoke. The PSP is required under the Confidence In Law Enforcement Act ("CILEA") to suspend any members who are charged with crimes that can result in prison sentence of one year or greater.

After obtaining the arrest warrant, Krawetz arrested Gula and took her into custody at PSP Hazleton. Gula was charged with the following crimes: Unlawful Use of Computer; Computer Trespass; Criminal Use of

Communication Facility; False Report-Falsely Incriminate Another; False Reports–Reported Offense Did Not Occur; Unsworn Falsification to Authorities. *See* the docket sheet for the Court of Common Pleas of Luzerne County, Case No. CP-40-CR-0001057-2013, Commonwealth v. Carrie Ann Gula.[4] (Doc. 81-7, Doc. 55-1). She was then arraigned and released on unsecured bond.

On December 4, 2012, Gula complained to Jennings, the Fern Ridge station commander, regarding alleged constituted harassment. Jennings decided Gula's complaints of harassment warranted a Blue Team Entry report which he issued. (Doc. 53 at 86, 88). Jennings informed his supervisors, including Hoke, that he issued the Blue Team Entry regarding the alleged inappropriate conduct directed toward Gula by male troopers in the Fern Ridge Barracks. As such, an Internal Affairs Investigation, number IAD 2012-0811, was commenced in December 2012.

On December 10, 2012, Hoke sent an email with the subject "Carrie Gula" to Captain Degnan, Commanding Officer of Troop P Wyoming, with a copy to Robert Bartal, the investigator for Jennings's Blue Team Entry. This was sent at the time that Troop P was investigating the domestic violence incident alleged by Gula.

---

[4]Gula's Luzerne County Criminal Docket for case number CP-40-CR-0001057-2013 can be found at http://ujsportal.pacourts.us. The court takes judicial notice of Gula's Luzerne County Criminal Docket as an official state court record.

On December 12, 2012, IAD of the PSP interviewed Gula regarding the Blue Team Entry filed by Jennings pertaining to the harassment she was allegedly experiencing. Hoke indicated that he spoke with the person who interviewed Gula that day. Later on December 12, 2012, Krawetz met again with the Luzerne County DA with respect to the Gula criminal investigation. As indicated, the next day Gula was arrested on criminal charges.

On March 27, 2013, Gula had her preliminary hearing with respect to her the criminal charges, (Doc. 81-8), and the charges were bound over to county court for trial.

Gula's criminal trial commenced on March 17, 2014. (Doc. 81-12). Prior to trial, the ADA withdrew Count 1, Unlawful Use of Computer and Count 3, Computer Trespass. (Doc. 81-13). At the conclusion of the trial, the jury found Gula not guilty of all remaining charges.

On March 21, 2014, Gula was placed on restricted duty by Lieutenant Daniel J. Gentile, Jr. pending the outcome of the internal affairs investigation into her alleged false reports. Gula was then disciplined for providing false information to investigators regarding the alleged domestic violence incident.

On June 11, 2014, a Disciplinary Action Report ("DAR") was issued to Gula charging her with the following violations of field regulations: Unbecoming Conduct; Conformance to Laws; Internal Investigations; and Providing False Information.

On September 24, 2014, PSP brought administrative charges relating

to false statements which notified her that she was to be dismissed from the PSP, and would be placed in a suspension without pay status pending the filing of any grievance by her.

On September 25, 2014, a memo was issued indicating that the PSP decided to court martial Gula. Lt. Col. George Bivens approved Gula's court martial on September 30, 2014.

Subsequently, Gula successfully pursued a grievance against the PSP through arbitration. The arbitration award dated March 16, 2015 sustained Gula's grievance regarding her court martial and the arbitrator found that the Commonwealth failed to show just cause for Gula's termination by clear and convincing evidence. However, Gula remained on suspension without pay until the award was issued. Gula was then reinstated to her position as a trooper with the PSP with all the entitlements of employment, including back pay for the period of suspension imposed pursuant to the CILEA.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)*; Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute

is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law*. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)*; Aetna Casualty & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249 ; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party*. Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact*. Celotex*, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.*" In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny,*

139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio, 475 U.S. 574, 586 (1986)*). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial.*"* *Celotex Corp.*, 477 U.S. at 322-23; *Jakimas v. Hoffman La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

"The motion for summary judgment requires Plaintiff to present evidence that there does exist a genuine issue of material fact, and Plaintiff may not rely solely on the pleadings." *Isajewicz v. Bucks County Dept. Of Communications*, 851 F.Supp. 161, 165 (E.D.Pa. 1994) (citing *Celotex*, 477 U.S. at 322).

As to a hostile work environment claim, the plaintiff must show that "1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability." Mandel v. M&Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013). Any finding regarding the hostility of a work environment "must be determined by the totality of the circumstances." Fichter v. AMG Resources Corp., 528 F.App'x 225, 230 (3d Cir. 2013). Put another way, "the workplace

must have been 'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment..." McSparran v. Pennsylvania, 2014 WL 1371594 (M.D.Pa. 2014) (citing Fichter, 528 F.App'x 225).

## IV.    DISCUSSION

With respect to the instant motion, (Doc. 34), Gula essentially claims that she was improperly criminally charged and suspended without pay by the PSP defendants as retaliation for her complaint of sexual harassment against Brackett, for giving statements in other IAD investigations, and for her complaints of a hostile work environment at the Fern Ridge Barracks in violation of the First Amendment, Title VII and the PHRA. She also claims that the PSP defendants unlawfully discriminated against her based on her gender and created a hostile work environment in violation of both Title VII and the PHRA.

In Count I of her amended complaint, Gula raises a First Amendment retaliation claim against all defendants under §1983. In Count VII, Gula asserts a claim against the PSP for unlawful retaliation in violation of Title VII and, in Count VIII, she asserts a retaliation claim against all defendants under the PHRA. As mentioned, the court has previously granted the motion for partial summary judgment of Krawetz, Brogan and O'Hara with respect to all

13

of Gula's PHRA claims, Counts IV, VI and VIII. The court has also dismissed with prejudice all of Gula's PHRA claims against the PSP since they are barred by the Eleventh Amendment. (Doc. 97). Thus, Gula's First Amendment retaliation claim against all defendants, Count I, remains. Also remaining are Gula's retaliation claim under Title VII against PSP, Count VII, as well as her retaliation claim under the PHRA against Dougalas and Hoke, in their individual capacity, Count VIII.

### A. Count I, First Amendment Retaliation Claim

In Count I, Gula asserts a First Amendment retaliation claim under 42 U.S.C. §1983 against Brogan, Krawetz, O'Hara, Dougalas and Hoke, in their individual capacity.

To state a claim under §1983, a plaintiff must meet two threshold requirements. She must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, she was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986). "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988). *See also* Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir. 2003) (citing Rode). "Personal

involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207.

In order to establish a First Amendment retaliation claim, a public employee must show: (1) that his or her speech is protected by the First Amendment; and (2) that the speech was a substantial or motivating factor of the employer's retaliatory action(s). Flora v. County of Luzerne, 776 F.3d 169, 174 (3d Cir. 2015) (citing Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009)). "The first factor is a question of law; the second factor is a question of fact." Gorum, 561 F.3d at 184 (quoting Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006)). If these two elements are established, the burden shifts to the employer to show that it would have taken the same action regardless of the speech. Flora, 776 F.3d at 174.

"The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). If public employees speak in the course of their employment, "the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421. However, if an

employee speaks as a citizen on a matter of public concern, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id. at 418.

"[T]he question of whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." Foraker, 501 F.3d at 240. The majority approach has interpreted this language to mean that "the ultimate question of whether speech is made pursuant to a public employee's official duties is a question for the Court to decide, whereas the question of whether certain factual circumstances exist is a question amenable to resolution by a jury." Baranowski v. Waters, 2008 WL 4000406, at *19 (W.D.Pa. Aug. 25, 2008) (citations omitted).

The inquiry required under *Garcetti* to determine whether an individual is acting pursuant to his official duties is a "practical one" that does not turn on a given employee's formal job description. Garcetti, 547 U.S. at 424-25. Expression does not have to fall within a public employee's job description or response to an employer's inquiry in order to constitute speech made pursuant to the speaker's official duties. Weintraub v. Board of Education, 593 F.3d 196, 203 (2d Cir. 2010). Factors relevant to the analysis include the employee's duties, the impetus for his or her speech, the setting and subject

matter of that speech, and the identities of the individuals to whom that speech is addressed. *See* Brown v. Tucci, 2013 WL 2190145 (W.D. Pa. May 20, 2013) (citing Weisbarth v. Geauga Park District, 499 F.3d 538, 546 (6th Cir. 2007)). Consideration may also be given to "whether the speech was made inside or outside of the workplace and whether it concerned the subject matter of the speaker's employment." Id. (citing Handy-Clay v. City of Memphis, 695 F.3d 531, 540-41 (6th Cir. 2012)).

Defendants Brogan, Krawetz, O'Hara, Dougalas, and Hoke argue that they are entitled to summary judgment on Gula's First Amendment retaliation claim because she did not speak out on a matter of public concern. Gula alleges that she exercised her First Amendment rights by complaining of on-going sex discrimination, retaliation, hostile work environments, and by engaging in protected union activity by filing grievances. (Doc. 19 at 33). Specifically, Gula alleges that she exercised her First Amendment rights by lodging a sexual harassment complaint against Brackett at the Trevose Barracks, by giving statements in other IAD investigations involving sexual misconduct at the Trevose Barracks, by complaining to Jennings on December 4, 2012 that she was being harassed at the Fern Ridge Barracks which resulted in an IAD investigation, and by complaining about the alleged August 1, 2012 domestic assault by Thomas. Defendants respond by stating

that "[Gula's] protected speech which included testimony in investigations involving alleged sexual misconduct was unknown to four of the Defendants at the time they made their determinations regarding prosecution of, and disciplining [Gula]." (Doc. 91 at 14).

As mentioned above, Brogan, Hoke, Krawetz and Dougalas were not aware of the Brackett IAD prior to the filing of the present action. (Doc. 35 at 2-3). Thus, Gula's statements about sexual misconduct by Brackett cannot be the basis for her First Amendment claim against these four defendants. *See* Ambrose v. Twp. of Robinson, 303 F.3d 488, 494 (3d Cir. 2002) (court held that temporal proximity alone cannot establish causation with respect to a First Amendment retaliation claim without additional evidence of the defendant's knowledge of the protected activity); Cooper v. Menges, 541 Fed. Appx. 228, 232 (3d Cir. 2013) ("The defendant must be aware of the protected conduct in order to establish the requisite causal connection." (citations omitted). Further, to maintain a constitutional claim against a defendant under §1983, plaintiff must show that each defendant had personal involvement in the alleged violation of plaintiff's rights. *See Rode, supra*. The alleged personal involvement of Brogan, Hoke, Krawetz and Dougalas regarding Gula's retaliation claim based on the Brackett IAD is insufficient since they were not aware of it when they took their alleged retaliatory actions against

her.

Additionally, when Gula was stationed at the Trevose Barracks, she provided statements in other IAD investigations which were conducted at the Trevose Barracks. Brogan, Hoke, Krawetz and Dougalas were not aware that Gula had made statements in other IAD investigations at the Trevose Barracks. (Id. at 3). As such, Gula's statements about other IAD investigations involving the Trevose Barracks cannot be the basis for her First Amendment claim against these four defendants. *See Ambrose, supra*.

However, there is sufficient evidence that the five individual defendants were aware of other statements Gula made which she alleges constituted protected speech. On August 2, 2012, Krawetz assigned Brogan to investigate Gula's assault allegations against Thomas, and they both determined the allegations were "unfounded." Gula alleges that Brogan's investigation contained false and misleading information and that it omitted material evidence favorable to her. On August 8, 2012, Krawetz entered a Blue Team Entry alleging misconduct against Gula for filing a false report about the Thomas assault incident and he also opened a criminal investigation into Gula. On August 9, 2012, Dougalas placed Gula on restricted duty status pending the outcome of the criminal and internal investigations. When Gula was arrested on December 13, 2012 by Krawetz,

she was suspended without pay by Hoke. When O'Hara received the IAD regarding the misconduct charge against Gula for making false reports, prior to making his recommendations with respect to sanctions as DDO, he reviewed the criminal investigation file regarding her assault allegation against Thomas as well as the Brackett IAD and other IADs in which Gula gave statements as a witness. (Doc. 53 at 9).

Thus, there is sufficient evidence that Brogan, Hoke, Krawetz, O'Hara and Dougalas were all aware that Gula had made some of the statements which she alleges constituted protected speech with respect to her First Amendment retaliation claim.

Gula also states that in May and June of 2012, "[she] reported a male member of the State Police who made threats to harm himself, which is a matter of public concern." Gula further states that she "provided information concerning potential drug activity, implicating her ex-boyfriend [Thomas] and John Estock who was later charged with, convicted of, and imprisoned for federal drug crimes." As such, Gula states that "[r]eporting drug activity observed as a citizen is certainly a matter of public concern." Additionally, Gula indicates that she made statements about arresting an Exeter Township politician. (Doc. 87 at 15-16). However, with respect to these three statements, since Gula has not pointed to evidence to show that any of the five individual

20

defendants knew about them, her First Amendment claim based on these statements fails. *See Ambrose, supra*. Nor does she point to any evidence to show that these statements were the cause of any alleged retaliatory actions.

The court will now focus on whether Gula's statements about domestic violence, harassment and sexual misconduct which she alleges resulted in the criminal charges, the misconduct charge, and the IAD investigation are matters of public concern that can support Gula's First Amendment claim.

Defendants state that none of the instances of protected speech alleged by Gula "address a societal or political concern of the community" and that they all "are related to conduct that was personal to Gula and involved her interpersonal relationships at work and in her private life." They also point out that "a public employee's internal complaint is not protected by the First Amendment where there is no evidence in the record that the employee made a public statement nor sought to advance a political or social point of view beyond the employment context." (Doc. 36 at 19-20) (citing Borough of Duryea v. Guarnieri, 564 U.S. 379, 131 S.Ct. 2488, 2501 (2011)). Defendants also cite to Sharif v. Manning, 2013 WL 3754818, \*12 (M.D.Pa. July 11, 2013), in which the court held that plaintiff's internal grievances and internal appeal with the PSP of an IAD complaint against him were not matters of public concern giving rise to a First Amendment claim. As such, defendants

contend that the harassment complaints made by Gula do not constitute public speech and that they are "internal complaints that do not rise to a matter of public concern." (Id. at 20).

Additionally, defendants state that there is no evidence in the record that Gula's statements regarding the IAD investigations of which O'Hara was aware were the cause of any alleged retaliatory actions. However, Gula has shown that the criminal investigation was initiated against her shortly after Brackett was disciplined, that the criminal charges against her were filed the day after she gave her statement in the IAD investigation regarding her complaint of harassment at the Fern Ridge Barracks, and that she was disciplined and suspended without pay because she engaged in these activities which constitutes unlawful retaliation. Gula also maintains that her speech was made "pursuant to her independent duties as a citizen, and it was made as a public citizen, not pursuant to [her] ordinary job duties as a [PSP] Trooper." (Doc. 87 at 12).

The court will now address the specific requirements to determine whether Gula's speech was a matter of public concern. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."

Garcetti, 547 U.S. at 421. A public employee's speech is only protected when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he [or she] made." *Flora*, 776 F.3d at 175 (quoting Garcetti, 547 U.S. at 418). The defendants mainly challenge the first prong of this three-part inquiry.

Whether a public employee is speaking as a citizen turns upon the question of "whether the speech at issue is itself ordinarily within the scope of an employee's duties." Lane v. Franks, 134 S.Ct. 2369, 2379 (2014). The Supreme Court and the Third Circuit have clarified that the test should not be whether the speech "concerns" or was "related to" those duties. *Id.* at 2379; Flora, 776 F.3d at 178–79. The inquiry is a mixed question of law and fact; "the scope and content of [the public employees] . . . job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law." Flora, 776 F.3d at 175.

There is no "comprehensive framework" for defining the scope of an employee's duties. *Garcetti*, 547 U.S. at 424.

> The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an

> employee's written job description is neither necessary nor
> sufficient to demonstrate that conducting the task is within the
> scope of the employee's professional duties for First Amendment
> purposes.

*Id*. at 424–25. In *Lane v. Franks*, 134 S.Ct. at 2380, the Supreme Court found

that grand jury testimony given by a supervisor about a subordinate employee

who was indicted for mail fraud and theft of receiving federal funds was citizen

speech. The employee's testimony included statements that the subordinate

employee performed "virtually no services," "generated virtually no work

product," and "rarely even appeared for work." *Id*. at 2375. The Supreme

Court determined that this testimony was protected even though the

information underlying the testimony was gathered due to the speaker's role

as supervisor. *Id*. at 2375, 2380. The Supreme Court focused on the manner

of the speech as sworn testimony and found that such testimony fell outside

the ordinary responsibilities of the supervisor. *Id*. at 2379. The Supreme Court

also "recognized that speech by public employees on subject matter related

to their employment holds special value precisely because those employees

gain knowledge of matters of public concern through their employment." *Id*.

at 2379.

In the instant case, the court finds that Gula's ordinary job

responsibilities as a PSP trooper did not include providing statements in

sexual misconduct cases involving male members of the PSP at the Trevose Barracks, complaining about work place harassment, and complaining about an alleged domestic violence incident. The court cannot conclude that all of these activities fell within Gula's ordinary job responsibilities and finds that she has presented sufficient evidence to show that she was speaking as a citizen and not as PSP trooper. Further, the court finds that defendants' reliance on the *Sharif* case regarding the filing of internal grievances is not persuasive in light of the subsequent precedential *Flora* case decided by the Third Circuit.

The fact that Gula became aware of the misconduct issues in the barracks by virtue of her position as PSP trooper does not automatically mean that her speech is unprotected. *See Flora*, 776 F.3d at 177–78. The *Lane* case explains that the proper inquiry in distinguishing between unprotected employee speech and protected citizen speech is "whether the speech at issue is itself ordinarily within the scope of [the] employee's duties." 134 S. Ct. at 2379. Thus, it is no longer the appropriate inquiry as to whether the issues raised by Gula relate to or concern her job duties. *Id.* at 2379; *Flora*, 776 F.3d at 178–79. As such, Gula's speech, particularly her speech about alleged sexual harassment and misconduct in the workplace as well as her speech regarding domestic violence, can be said to have sought "to advance a

political or social point of view beyond the employment context", Guarnieri, 131 S.Ct. at 2501, making them matters of public concern. *See* Snyder v. Phelps, 562 U.S. 443, 453 (2011). Further, Gula has shown that she made more than one complaint about sexual harassment and misconduct in the workplace. "Claims of sexual and racial discrimination can constitute matters of public concern, even if plaintiff makes those claims in private." Middleton v. Deblasis, 844 F.Supp.2d 556, 564 (E.D.Pa. 2011). Although, "speech that relates solely to mundane employment grievances does not implicate a matter of public concern," Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 467 (3d Cir. 2015), "governmental inefficiency and misconduct is a matter of considerable significance." Garcetti, 547 U.S. at 425.

Gula's interest in providing truthful statements about the alleged inappropriate behavior and misconduct clearly outweighs the PSP's interest in avoiding workplace disruptions. With respect to the final requirement, there is sufficient evidence, as detailed above, to show that Gula's statements were a substantial or motivating factor for retaliatory action. For instance, Gula has shown that after she complained about harassment in the Fern Barracks to Jennings and the day after she gave a statement in the resulting IAD investigation, she was arrested and criminally charged by Krawetz. The court also finds, as detailed above, that Gula's stated protected speech had

sufficient temporal proximity to the alleged retaliatory acts.

Next, even though defendants do not address this requirement, the court finds that Gula provided sufficient evidence to show that the defendants did not have "'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement[s] [she] made.'" Flora, 776 F.3d at 175 (quoting Garcetti, 547 U.S. at 418). The court utilizes the *Pickering* balance test which requires that the court "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. "In performing this balancing, the manner, time, place, and entire expression of the context of the expression are relevant." *Swartwelder v. McNeilly*, 297 F.3d 228, 235 (3d Cir. 2002). Specifically, a plaintiff's interest as a citizen as well as the public's interest in the speech must be balanced against the government's interest "as an employer, in promoting workplace efficiency and avoiding workplace disruption." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 991 (3d Cir. 2014). The defendants have not argued what interest they have in suppressing Gula's speech in the context of the PSP and without any assertion or demonstration of a government interest, the balance tips in Gula's favor. *See Lane*, 134 S. Ct. at

2381.

Thus, the court will deny defendants' motion for summary judgment with respect to Gula's First Amendment retaliation claim as against Brogan, Hoke, Krawetz, O'Hara and Dougalas.

### B. Counts III and IV, Sex Discrimination Claims Under Title VII and the PHRA

In Count III, Gula raises her sex discrimination claim under Title VII against the PSP and, in Count IV, her sex discrimination claim under the PHRA against all defendants.[5] However, her sex discrimination under the PHRA against only Dougalas and Hoke remains. Defendants contend that they are entitled to summary judgment on Gula's sex discrimination claims because she cannot show that similarly situated non-protected class (i.e., male) employees of the PSP were treated more favorably. Gula argues that there are genuine issues of material fact in dispute for her sex discrimination claims precluding summary judgment for defendants.

_____

[7]The court notes that the analysis of all of Gula's Title VII claims applies equally to all of her PHRA claims. *See Rozic v.Trinity Industries, Inc.*, 47 Fed. Appx. 151, 152 (3d Cir. 2002); *Davis v. Tammac Corp*. 127 F. Supp. 2d 625, 629 n. 6 (M.D. Pa. 2000) ("Claims brought under the PHRA are analyzed under the same standards as their federal counterparts.") (citations omitted); *Thimons v. PNC Bank, N.A.*, 254 Fed. Appx. 896, 897 n. 1 (3d Cir. 2007); *see also* Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (race and gender discrimination claims under Title VII and the PHRA are analyzed together for summary judgment purposes).

In Howard v. Blalock Elec. Service, Inc., 742 F.Supp.2d 681, 689-90 (W.D.Pa. 2010), the court explained:

> Title VII's anti-discrimination provision provides that it is an "unlawful employment practice" for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. §§2000e–2(a)(1). In Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 63–69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the United States Supreme Court recognized that an employer discriminates against an employee because of his or her sex when it engages in sex-based harassment that is sufficiently "severe or pervasive" to alter the "terms, conditions, or privileges" of his or her employment. The holding in Meritor Savings Bank applies with equal force to harassment based on an individual's race, color, religion or national origin. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276, n. 5 (3d Cir. 2001). Harassment which does not alter the "terms, conditions, or privileges" of one's employment, however reprehensible it may be, does not run afoul of Title VII. Meritor Savings Bank, 477 U.S. at 67, 106 S.Ct. 2399. An isolated incident amounts to a change in the "terms, conditions, or privileges" of one's employment only if it is "extremely serious." Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Title VII's anti-discrimination provision prohibits only those forms of discriminatory harassment that are severe or pervasive enough to create a hostile or abusive working environment. Pennsylvania State Police v. Suders, 542 U.S. 129, 146–147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

(footnote omitted).

Section 2000e-2(m) of Title VII (42 U.S.C.) provides, in pertinent part, that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a

motivating factor for any employment practice, even though other factors also motivated the practice." Title VII "prohibits employers from discriminating against individuals on the basis of their race, color, religion, sex, or national origin." *Burton v. Teleflex, Inc*., 707 F.3d 417, 426 n. 7 (3d Cir. 2013) (citing 42 U.S.C. §20002-2(a)(2)).

In Jones v. SEPTA, 796 F.3d 323, 327 (3d Cir. 2015), the Third Circuit stated:

> To state a prima facie case of gender discrimination [under Title VII], [plaintiff] [is] required to show that (1) she is a member of a protected class; (2) she was qualified for her position; (3) [she suffered] an adverse employment action; and (4) the circumstances of the [adverse employment action] give rise to an inference of discrimination.

*See also Page v. Trustees of Univ. of Pennsylvania*, 222 Fed. Appx. 144, 145 (3d Cir. 2007); *Jones v. Sch. Dist. of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999).

The Court in *Burlington v. News Corp*., 759 F.Supp. 2d at 592-593 (E.D.Pa. 2010), stated:

> Although showing that similarly situated coworkers were treated more favorably than the plaintiff is one method of satisfying the final element of a prima facie case of discrimination, it is not the only one. The Third Circuit has explained that although some circuits have required plaintiffs to make such a showing in discrimination cases, "that is not the current law in this or the majority of the circuits." *Sarullo,* 352 F.3d at 798 n. 7 (citations omitted). Indeed, the Third Circuit has counseled in *Sarullo* and elsewhere that the prima facie case is intended to be a flexible standard. *See id.* at 797–98 ("[T]he prima facie test remains

flexible and must be tailored to fit the specific context in which it is applied." (citing *Geraci v. Moody–Tottrup, Int'l, Inc.,* 82 F.3d 578, 581 (3d Cir. 1996)); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir. 1990) ("The framework set forth in *McDonnell Douglas,* which begins with proof of a prima facie case, was 'never intended to be rigid, mechanized, or ritualistic.' " (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978))). The Third Circuit has stated that to establish a prima facie case, it is sufficient for a plaintiff to adduce evidence that "establishes a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a juror could infer, in light of common experience, that the defendant acted with discriminatory intent." *Anderson v. Wachovia Mortg. Corp.,* 621 F.3d 261, 275 (3d Cir. 2010) (discussing prima facie case in §1981 context); *Sarullo,* 352 F.3d at 798 (plaintiff "must establish some causal nexus between his membership in a protected class" and the adverse employment decision to establish a prima facie case of discrimination in Title VII case).

Also, "the burden to establish a prima facie case is not an onerous one."

*Young v. St. James Management, LLC,* 749 F.Supp. 2d 281, 288 (E.D. Pa. 2010). The elements are dependent on the facts of the specific case. *Id.* (citation omitted). The plaintiff's burden of proof is a preponderance of the evidence standard. Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996).

Moreover, in Carroll v. Lackawanna County, 2015 WL 5512703, *5 (M.D.Pa. Sept. 16, 2015), the court stated that "[g]ender discrimination claims brought under Title VII, the PHRA, and the Equal Protection Clause are governed by the *McDonnell Douglas* burden-shifting framework." (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973);

Stewart v. Rutgers, 120 F.3d 426, 432 (3d Cir.1997) (applying the *McDonnell Douglas* framework to analyze discrimination claims under the Equal Protection Clause)). The court in *Carroll*, *id*., stated that "[u]nder the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of employment gender discrimination [by showing that]: (1) she is within a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) [ ] a similarly situated individual outside the plaintiff's protected class was treated more favorably." (citations omitted). Also, "[t]he determination of whether a prima facie case has been made [regarding gender discrimination claims brought under Title VII and the Equal Protection Clause] is a legal one for the court to decide." *Id*. (citing Pivirotto v. Innovative Sys., 191 F.3d 344, 347 n. 1 (3d Cir. 1999)).

Defendants state that "[i]n making her claim that she was discriminated against based upon her gender with regards to her suspension without pay and court martial, Gula cannot prove a prima facie case. Gula cannot prove the fourth element: that similarly situated men were treated better than Gula." (Doc. 36 at 22). They state that all employees of the PSP are suspended without pay if they are arrested for crimes that can result in a prison sentence of one year or more. They also state that Gula's court martial was primarily determined by her failure to respond "100% truthfully" in the IAD investigation initiated to see if she gave false reports. Thus, they maintain that Gula has

failed to prove that similarly situated males were treated more favorably than her.

The court finds that Gula has submitted enough evidence from which a factfinder could reasonably conclude that the PSP treated her less favorably than similarly situated male employees. Gula has presented evidence that she was investigated both criminally and internally by the PSP and then placed on restricted duty, arrested, suspended without pay, and court martialed for allegedly giving false statements about the incident with Thomas. She also presented evidence to support her contention that the PSP and its officials filed criminal charges against her based on an affidavit of probable cause that contained false and misleading statements and withheld exculpatory evidence. Gula has produced sufficient evidence that other male members of the PSP were treated differently than she was. She showed that Brackett, a male trooper, was not arrested and criminally charged for grabbing her at the Trevose Barracks and pulling her on his lap or for using the PSP computers on work time to sexually harass her. Nor was Brackett court martialed after the IAD investigation commenced due to Gula's complaints. Rather he was given a short suspension without pay and the sexual misconduct charges were removed from his record after his administrative appeal. Gula also presented evidence to dispute the date that Jennings testified he prepared his electronic notes typed on his computer shortly after she reported the incident

with Thomas to him, and that he actually created the notes at a much later date to discredit her report. Gula showed that Jennings was not investigated either criminally or internally, was not disciplined, was not arrested for perjury, was not suspended without pay and, that he was not court martialed for the inconsistency she contends was a lie. Gula also showed that female troopers charged with allegedly lying were court martialed, namely, Andrea Young, a female trooper who was given a misconduct and court martialed for allegedly lying, and herself. She showed that during Hoke's long experience with the PSP he had never been in a position where he had to ask for a prosecutorial decision on whether to prosecute a member of the PSP. (Doc. 60 at 18). Gula showed that Jennings did not recall a male trooper who was ever placed on restricted duty for domestic violence charges. Gula further showed that Jennings did not do a Blue Team Entry or report to his superiors that a male trooper in the Fern Ridge Barracks alleged threatened to kill himself. (Doc. 53 at 14, 19). She also demonstrated that Jennings did not write a Blue Team Entry about a male trooper who was upset with another male trooper, and flipped a table over at work. (Doc. 53 at 14-15).

Therefore, the court will deny defendants' summary judgment motion with respect to, Gula's sex discrimination claim under Title VII against the PSP, Count III, and, her sex discrimination claim under the PHRA against Hoke and Dougalas in Count IV.

34

### C. Counts V and VI, Hostile Work Environment Claims Under Title VII and the PHRA

In Count V, Gula raises her hostile work environment claim based on sex under Title VII against the PSP. In Count VI, her hostile work environment claim based on sex under the PHRA remains against Dougalas and Hoke. Defendants argue that they are entitled to summary judgment on Gula's hostile work environment because the alleged harassment was not based on her gender and was not severe or pervasive.

In order for an employee to establish a claim of harassment, the court in Taylor v. JFC Staffing Assoc., 690 F.Supp.2d 357, 367-68 (M.D.Pa. 2009), stated that the plaintiff must show the following five elements:

> (1) [plaintiff] suffered intentional harassment based on [gender]; (2) the harassment was severe or pervasive; [fn 4]; (3) the harassment detrimentally affected [plaintiff]; (4) the harassment would have detrimentally affected a reasonable person in like circumstances; and (5) there is a basis for employer liability [for the harassment under a theory of respondeat superior liability].
> Fn4. The Third Circuit has often stated that discriminatory harassment must be "severe and pervasive." *See e.g.,* Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); West v. Phila. Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995); Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990). But the Supreme Court's standard is "severe or pervasive." Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). As the Third Circuit recognized in Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), "the difference is meaningful, and the Supreme Court's word controls." Id. at n. 3. By using the disjunctive "or" the Supreme Court clearly meant that "severe" and "pervasive" are alternative possibilities. In other

words, some conduct, although isolated and sporadic, may be severe enough to contaminate the workplace; whereas, other, less objectionable, conduct must be pervasive in order to contaminate the workplace such that it meets the threshold under the second prong of a hostile work environment claim.

"When a workplace is so permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [a] victim's employment and create an abusive working environment, Title VII is violated." Oncale v. Sundowner Offshore Srvs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

The same standards apply to hostile work environment claims under Title VII and the PHRA based on gender discrimination with the word "discrimination" substituted for the word "harassment" in elements 1-4 stated above. *See* Mufti v. Aarsand & Co., Inc., 667 F.Supp.2d 535, 544 (W.D.Pa. 2009) (citations omitted). Thus, to prove a hostile work environment claim under Title VII, plaintiff must show that: (1) she suffered intentional discrimination because of her [gender]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability. Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).

"[A] court's hostile work environment analysis 'must concentrate not on

36

individual incidents, but on the overall scenario' because it is often difficult to determine the motivation behind allegedly discriminatory actions." Syed, 906 F.Supp.2d at 355 (citation omitted). "In assessing the evidence presented, [the court] must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is ... relevant.... But while psychological harm ... may be taken into account, no single factor is required.'" Miller v. Thomas Jefferson Hosp., 565 F.3d 88, 93 (3d Cir. 2014) (citation omitted).

In viewing the facts of record and all reasonable inferences derived therefrom, in the light most favorable to Gula, the court finds that Gula has produced enough evidence to create a genuine issue of material fact for a jury to resolve. As detailed above, Gula has submitted sufficient evidence from which a reasonable factfinder could infer that the incidents of harassment and discrimination at the PSP were motivated by gender animus and, she has produced enough evidence to show a severe and pervasive hostile work environment causing her to be visibly upset and to report the harassment at both barracks. When she was stationed at the Trevose Barracks, Brackett sent emails at work asking Gula about her "tan lines" and referring to her as

37

a "kitten," he pulled her onto his lap at the work place, and he made Gula feel uncomfortable at work due to his repeated unwanted sexual advances. Gula was also harassed at the Fern Ridge Barracks requiring Jennings to issue a Blue Team Entry over the incidents. Also, when Gula was transferred to the Fern Ridge Barracks, she was required to use the same bathroom as the male troopers since special arrangements were not made to accommodate her. (Doc. 53 at 16). Gula was then court martialed in September 2014, after she was acquitted of all criminal charges, and she was suspended without pay for months while her arbitration was pending until she prevailed.

Thus, there is sufficient evidence in the above stated record to show that genuine disputes of material fact exist as to whether plaintiff suffered intentional harassment or discrimination at the PSP, and that she endured a severe and pervasive hostile work environment.

As such, the court will deny defendants' summary judgment motion with respect to Gula's hostile work environment claim based on sex against the PSP under Title VII, and against Dougalas and Hoke under the PHRA.

### D. Counts VII and VIII, Retaliation Claims Under Title VII and the PHRA

Finally, in Count VII, Gula raises her retaliation claim under Title VII against the PSP, and in Count VIII, her retaliation claim under the PHRA against Dougalas and Hoke remains. Gula contends that the PSP violated

38

Title VII by retaliating against her for asserting her rights to work in an environment free of sexual discrimination and harassment. She states that after complaining to the PSP and its officials, she suffered illegal retaliation by them which was motivated due to her engaging in protected activity and being a member of a protected class. With respect to the PHRA retaliation claim, Gula states that she repeatedly warned the individual defendants that she was being subjected to discrimination through unfair and disparate practices taken against her and, that she was being subjected to a hostile work environment by defendants and her coworkers. She states that PSP's supervisory employees "failed or refused to investigate, alleviate, or eliminate the discrimination being practiced against [her] despite her complaints" and that the defendants' actions were illegally motivated by her engaging in protected activity and being a member of a protected class. (Doc. 19 at 56).

In order to properly plead a retaliation claim in violation of Title VII, a plaintiff must prove a *prima facie* case by providing facts showing that: (1) she was engaged in a protected activity; (2) she has suffered an adverse employment action based on exercise of the protected activity; and (3) there is a causal link between the protected activity and the adverse employment action. *Hussein v. UPMC Mercy Hospital*, 466 Fed. Appx. 108, 111-12 (3d Cir. 2012) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006)); *Farrell v. Planters Lifesavers Company*, 206 F.3d 271, 279 (3d Cir.

2000). Further, plaintiff must show a causal connection between her participation in a protected activity and the adverse employment action. *Thomas v. Pocono Mtn. Sch. Dist.,* 2011 WL 2471532, \*8 (M.D.Pa. June 21, 2011). "Causation 'may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Id.* (citation omitted).

In *Mufti*, 667 F.Supp.2d at 552, the court stated:

A plaintiff must participate in a protected activity to establish a retaliation claim. See Barber v. CSX Distribution Services, 68 F.3d 694, 700–701 (3d Cir. 1995) (finding a general letter of complaint that did not mention discrimination was not a protected activity). Protected activity includes formal charges of discrimination "as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." *See e.g.*, Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990). However, to constitute "protected activity," the employee must also have a "good faith, reasonable belief that a violation existed." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996).

To satisfy the third, "material adversity," element of a retaliation claim, plaintiff must prove that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hare v. Potter,* 220 Fed.Appx. 120, 128 (3d Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006)).

Further, "Title VII's anti-retaliation provisions [42 U.S.C. §2000e-3]

protect employees who oppose employment practices made illegal by Title VII." *Brangman v. Astrazeneca,* LP, 952 F.Supp.2d 710, 721 (E.D.Pa. 2013) (citation omitted). "The Plaintiff must therefore be opposing employment practices made illegal by Title VII." *Id*. (citation omitted). Also, "case law has established that opposition to an illegal employment practice must identify the employer and the practice – if not specifically, at least by context." *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc*., 450 F.3d 130, 135 (3d Cir. 2006). Moreover, "[a] general complaint of unfair treatment is insufficient to establish protected activity under Tile VII." *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc*., 450 F.3d at 135 (citations omitted). "[T]o succeed on a Title VII retaliation claim, an employee must have an 'objectively reasonable' belief that the activity he opposes constitutes unlawful discrimination under Title VII." *Ferra v. Potter*, 324 Fed.Appx. 189, 192 (3d Cir. 2009) (citation omitted). Thus, in order for plaintiff's complaints about her treatment by her co-workers to constitute protected activity under Title VII, a reasonable person must believe that the conduct complained of violated Title VII. *Id.* (citation omitted); *Barber v. CSX Distribution Servs*., 68 F.3d 694, 701-02 (3d Cir. 1995) (complaints about unfair treatment in general and expressions of dissatisfaction in the workplace "do[] not constitute the requisite 'protected conduct' for a *prima facie* case of retaliation.").

In *Hussein*, 466 Fed. Appx. at 112., the Third Circuit stated the following

41

about the PHRA in relation to Title VII:

> The PHRA, which we generally interpret consistently with Title VII, likewise forbids employers from retaliating against employees for asserting their rights under the PHRA. See *Fogleman v. Mercy Hosp.*, 283 F.3d 561, 567 (3d Cir. 2002)("The language of the PHRA is . . . substantially similar to [Title VII and other federal] anti-retaliation provisions, and we have held that the PHRA is to be [] interpreted as identical to federal anti-discrimination laws except where there is something specifically different . . . .") (citing *Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996)).

The court analyzes plaintiff's Title VII retaliation claim and her PHRA retaliation claim under the aforementioned Title VII retaliation *prima facie* requirements.

Defendants argue that the PSP, Dougalas and Hoke are entitled to summary judgment on Gula's Title VII and PHRA retaliation claims because there is no causal connection between her protected activities and her discipline. The protected activities in which Gula has shown she participated that are proscribed by Title VII and which she alleges resulted in retaliation are the Brackett IAD, other IAD investigations at the Trevose Barracks in which she gave statements, and her complaint to Jennings of a hostile work environment at the Fern Ridge Barracks. The adverse employment actions Gula claims were caused by her protected activities included her placement on restricted duty (in which she was ordered to surrender her weapon and ID) and the criminal investigation following her report of the domestic violence incident with Thomas, which occurred shortly after the Brackett IAD, as well

42

as her two suspensions without pay and her court martial. Gula also claims that the PSP, as well as supervisory officials Dougalas and Hoke, were aware of her protected conduct and of the ensuing adverse employment actions taken against her. The evidence showed that Douglas sustained two separate allegations of misconduct against Gula, one for false reports and the second for "lying in a criminal and an administrative investigation."

The court finds disputed material facts exist regarding Gula's retaliation claims. Defendants state that they have shown that all members of the PSP are suspended without pay under CILEA when they are arrested for crimes that can result in a prison sentence of one year or more. While this may justify Gula's first suspension without pay, it does not explain her second suspension without pay after the jury acquitted her of all of the criminal charges. Defendants also contend that Gula's court martial was mainly determined by her failure to "100% truthfully" respond in the IAD investigation as to whether she gave false statements regarding her domestic assault allegations against Thomas. After Gula was court martialed following her acquittal of the criminal charges, including the charges that she gave false reports to authorities about the domestic assault incident with Thomas, she returned to work but her duties were restricted. In September 2014, Gula was court martialed and suspended without pay for months while her arbitration was pending. She eventually prevailed at arbitration upon the arbitrator's

finding that the PSP lacked clear and convincing evidence to terminate her and, she was reinstated to her position with the PSP and awarded back pay and benefits.

Thus, the court will deny defendants' motion with respect to Gula's Title VII and PHRA retaliation claims against the PSP, and against Hoke and Dougalas, respectively.

## V.     CONCLUSION

For the foregoing reasons, the defendants' motion for partial summary judgment with respect to Gula's First Amendment retaliation claim, Count I, as against Brogan, Hoke, Krawetz, O'Hara and Dougalas is **DENIED**. The defendants' motion with respect to Gula's sex discrimination claim under Title VII against the PSP, Count III, and, her sex discrimination claim under the PHRA against Hoke and Dougalas, Count IV, is **DENIED**. The defendants' motion with respect to Gula's hostile work environment claim against the PSP under Title VII, and against Dougalas and Hoke under the PHRA, Counts V and VI, is **DENIED**. The defendants' motion with respect to Gula's Title VII retaliation claim against the PSP, Count VII, and her PHRA retaliation claim against Hoke and Dougalas, Count VIII, is **DENIED**. An appropriate order will follow.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATED: December 8, 2017**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-2210-03.wpd